UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

McCORD HENRY, as personal
representative of the ESTATE OF
LINDA HENRY,

    Plaintiff,

Case No. 1:25-cv-113

Hon. Hala Y. Jarbou

v.

MARTIN BLACK, et al.,

    Defendants.
_____/

## OPINION

Linda Henry was brutally killed by Jeffery Stratton in 2022. Her son, who is the plaintiff in this action, claims that his mother's assailant was only able to carry out the deed because Benzie County and certain of its sheriff's deputies do not protect women from threats of violence with the same vigor as they do men. Plaintiff's equal protection challenge fails because he cannot point to any action or inaction by the government or its agents that discriminated against Henry. And because that claim fails, the Court will not exercise supplemental jurisdiction over Plaintiff's state law claim. The Court will therefore dismiss the complaint altogether.

### I. BACKGROUND

The tragic events giving rise to this litigation occurred in February 2022, but Plaintiff's allegations of discriminatory acts by Benzie County and its employees stretch back more than a decade earlier. According to Plaintiff, Benzie County has long had a policy of discriminating or tolerating discrimination against women in the provisioning of protective services. The earliest allegations go back to 2010, when the county's animal control department assertedly did nothing about Henry's report that chickens on her property were decapitated. (Compl. ¶ 187.) Similar

indifference is purportedly exhibited by the county's settlement with a woman whose animals were killed by county employees. (*Id.* ¶ 186.) Other incidents pointed to are the sheriff's office's disregard of a 2017 report by a woman claiming that a group of men forced her off the road (*id.* ¶ 175–176) and its failure to follow up after another woman reported in January 2020 that a man exhibited "aggressive and threatening behavior" at her workplace (*id.* ¶ 177–183).

The pivotal allegations, however, concern the practices of the sheriff's deputies who are the individual defendants in this litigation and that the sheriff's office allegedly did nothing to correct. (*Id.* ¶ 77.) The complaint catalogs actions by those deputies that were allegedly discriminatory against women, starting with their response to a report a Michelle Lonoconus made about Jeffrey Stratton's behavior in April 2020. Lonoconus called the department on April 15 to report that Stratton was experiencing a mental-health crisis that left him suicidal. (*Id.* ¶ 100.) After the responding deputies departed from Stratton's house, having determined that he was "alive and well," an acquaintance of Stratton's took him to the hospital, and Lonoconus took Stratton's guns to protect him from harming himself. (*Id.* ¶¶ 104–105.)

Four days later, Stratton threatened Lonoconus with a rifle and assaulted her. (*Id.* ¶ 107.) Lonoconus again called the police, but the deputies who showed up—Defendants Martin Blank and Matthew Weaver—returned Stratton's guns and let him keep the rifle with which he assaulted Lonoconus. (*Id.* ¶ 52.) Blank and Weaver joked about Blank's giving "a nuts guy his guns back" and warned that "the women's resource center is gonna complain again," implying that the organization previously faulted the sheriff's office for its handing of similar incidents. (*Id.* ¶ 52.) The pair then dismissed the concerns of the resource center with vulgarity, with Blank responding to Weaver's mock-chiding with the message "suck it women lol" and Weaver in turn suggesting the center "eat a bag of dicks." (*Id.* ¶ 53.)

2

The complaint also points to a September 2020 incident involving Weaver and Blank to establish that the two deputies were biased against women. It alleges that a National Park Service ranger called the police because a man wearing a ski mask drove into her driveway and told the ranger that he knew "where you work" and "where you live." (*Id.* ¶ 166.) The park ranger's report was not acted on until her male superintendent put a call into the sheriff's office, which resulted in her statement being taken and little else. (*Id.* ¶¶ 169–171.) Weaver and Blank allegedly determined a few days after the incident that the man who threatened the ranger was named Hutch, who is purportedly a former deputy currently serving with another law enforcement agency. (*Id.* ¶ 172.) The two exchanged messages in which Blank told Weaver to let the ranger know that "hutch was just messing around" and Weaver complained that another deputy named Troy (which might be a reference to Defendant Troy Packard) failed to keep the rest of the office informed and noted that the Park Service thought the office was "not taking the incident seriously." (*Id.*)

The last example of bias concerns the sheriff's office's handling of reports by two women on February 3, 2022, that Stratton posed a danger to those around him. A few days beforehand, Stratton was arrested and charged with criminal sexual conduct in the fourth degree after having inappropriate contact with his neighbor TW's fourteen-year-old daughter, AW. (*Id.* ¶¶ 116–118.) On February 2, Stratton was released from jail subject to his adherence to the conditions set out in his pretrial release order, which specifically prohibited him from interacting with TW or AW. (*Id.* ¶ 121.) Stratton could be arrested without a warrant for violating any of the order's terms. (*Id.*)

The risk that he would return to custody did not deter Stratton from continuing to threaten those around him. On February 3, the day after his release from jail, Michelle Lonoconus called the sheriff's office to warn that Stratton was acting erratically. (*Id.* ¶ 122.) Deputy Blank did not "want to deal with" Stratton's "crazy ass," so he called him instead of evaluating his condition in

person. (*Id.* ¶ 124.) Stratton, who by this point appears to have been in the throes of a psychotic episode, stated that he "did not agree" with the county's mental-health service provider about the medication he should be on, and Blank, apparently finding this response satisfactory, marked Lonoconus's report as "cleared." (*Id.* ¶ 125.) Lonoconus contacted another mental-health provider to report Stratton's dangerous condition; the provider passed on the report to the sheriff's office, which did nothing except ask why Lonoconus was concerned about Stratton's behavior. (*Id.* ¶¶ 127–128.)

Stratton's conduct escalated further when, in defiance of his release order, he attempted to enter the home of TW and AW. The family reported the situation to the sheriff's office, which dispatched two deputies, Troy Packard and fellow defendant James Kosiboski, to the scene. Stratton was no longer there, but evidence of his presence was left in the form of the graffito scrawled on the family's front door and the snow tracks leading back to Stratton's house. (*Id.* ¶ 137.) The deputies nonetheless did not arrest Stratton for violating the release order, and after advising TW to apply for a personal protective order, they told her she was "all set for the night" and left. (*Id.* ¶¶ 139–140.) The prosecutor's office sought revocation of Stratton's bond the next day, but the complaint alleges that the prosecution's motion understated the danger Stratton posed to the public despite the first draft of the motion containing more detailed facts about the prior night's incident—details Plaintiff assumes were provided by Kosiboski and Packard. (*Id.* ¶¶ 141–146.) The motion was not acted on before Stratton killed Linda Henry that afternoon. (*Id.* ¶ 148.)

The complaint contrasts the sheriff's office's alleged bias against women with two examples of supposedly more robust responses to threats to men. The first is the "decisive and forceful" arrest of Stratton effectuated by an unnamed deputy, along with law enforcement officers from other agencies, after Stratton led police on a car chase that ended in his crashing his vehicle

4

in November 2021. (*Id.* ¶ 64; *see id.* ¶ 198.) The second is the office's publicly expressed sympathy for a male arson victim's plight and its suggestion that the community support the victim's family, which Plaintiff unfavorably compares to the office's failure to extend assistance to Plaintiff when he was securing his mother's now-broken doors and windows. (*Id.* ¶¶ 157–158.)

Based on these allegations, Plaintiff contends that Henry's right to equal protection under the Constitution and Michigan civil rights law was violated when Benzie County and the sheriff's deputies named in the complaint allowed Henry to die at Stratton's hands by withholding protective services from women because of their gender. (*Id.* ¶¶ 213, 227, 239.) All Defendants moved to dismiss the complaint for failing to state a plausible equal protection claim. (ECF No. 12.) The motion having been fully briefed (ECF Nos. 17, 18), the Court grants the motion and dismisses the complaint.

## II.   LEGAL STANDARD

A defendant may move to dismiss a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) when the plaintiff fails "to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Id*. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of elements of a cause of action, supported by mere conclusory statements, do not suffice."). The Court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not

'show[n]'—that the pleader is entitled to relief." *Id*. (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)).

### III.    ANALYSIS

The Fourteenth Amendment prohibits states from drawing distinctions that "burden a fundamental right, target a suspect class, or intentionally treat one differently from others similarly situated without any rational basis for the difference." *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 312 (6th Cir. 2005). Although disparities transparently based on gender, or that affect one gender so disproportionately to another that the intent to discriminate can be inferred, are subject to heightened scrutiny, *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 274 (1979), "[t]he threshold element of an equal protection claim is disparate treatment." *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006). Among the forms of differential treatment that withhold the equal protection of the laws is "selectively deny[ing]" the state's "protective services" to "disfavored" individuals. *Gardenhire v. Schubert*, 205 F.3d 303, 319 (6th Cir. 2000) (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989)); *see Bartalone v. Berrien County*, 643 F. Supp. 574, 577 (W.D. Mich. 1986). If a suspect classification does not appear on the face of a state law or rule, to establish that protective services are distributed unequally requires showing that similarly situated persons not encompassed by the suspect classification are granted more extensive protection and that the disparity is intentional. *Cf. Reynolds v. Szczesniak*, No. 21-2732, 2022 WL 3500191, at *7 (6th Cir. Aug. 18, 2022) (allegations that similarly situated white arrestees would be treated differently were implausible because hypothetical); *Carmichael v. City of Cleveland*, 571 F. App'x 426, 433 (6th Cir. 2014) (affirming dismissal of conclusory claim that murder victim was not protected because of her race).

Plaintiff's equal protection right was not violated because she does not allege that any Defendant—or any government official, for that matter—took or failed to take any action toward

Henry herself. An equal protection claim is premised on "the government treat[ing] *the plaintiff* 'disparately as compared to similarly situated persons.'" *See Ctr. for Bio-Ethical Reform v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (emphasis added) (quoting *Club Italia Soccer & Sports Org. v. Charter Township of Shelby*, 470 F.3d 286, 299 (6th Cir. 2006)). Plaintiff's argument is that because of the conduct of three Defendants on February 3—Deputies Kosiboski and Packard's failure to arrest Stratton for violating his bond on sexual-assault charges by coming to his alleged victim AW's home, and Deputy Blank's refusal to evaluate Stratton's mental state in person—Stratton was free to murder Plaintiff's mother the next day. On Plaintiff's own framing, it was AW or Lonoconus, not Henry, who was denied protection because of her gender. The Fourteenth Amendment does not grant every woman indirectly injured by the unequal treatment of one of them a derivative constitutional claim. Plaintiff's claim fails on the merits.

The same result would be reached if Plaintiff's standing to sue is put to the test. The doctrine of standing "ordinarily precludes a person from challenging the constitutionality of state action by invoking the rights of others." *Barrows v. Jackson*, 346 U.S. 249, 255 (1953). One against or toward whom no action was taken by the government, for good or for ill, cannot have been "'personally denied equal treatment' by the challenged discriminatory conduct," *Allen v. Wright*, 468 U.S. 737, 755 (1984) (quoting *Heckler v. Mathews*, 465 U.S. 728, 740–41 n. 9 (1984)), so they usually cannot contend that they have suffered the sort of deprivation that demonstrates "a real need to exercise the power of judicial review." *Warth v. Seldin*, 422 U.S. 490, 508 (1975) (quoting *Schlesinger v. Reservists to Stop the War*, 418 U.S. 208, 221–22 (1974)). Third-party standing is permitted when the nonlitigant is closely related to the plaintiff and is hindered from vindicating their own rights, *Crawford v. U.S. Dep't of Treasury*, 868 F.3d 438, 455 (6th Cir. 2017), but neither circumstance is presented here. Consequently, whether framed in terms of the

absence of standing or the failure to assert a viable cause of action, Plaintiff's inability to show that Henry was subjected to unequal treatment mandates dismissal of his claim against the individual defendants.

The absence of allegations permitting the inference that any government agent acted unconstitutionally toward Henry also disposes of Plaintiff's claim against Benzie County. A municipality generally cannot be held liable for a constitutional violation if none of its employees committed a violation either. *Roell v. Hamilton County*, 870 F.3d 471, 487 (6th Cir. 2017). This principle does not apply in "certain unusual circumstances," *Hart v. Hillsdale County*, 973 F.3d 627, 645 (6th Cir. 2020), such as when a municipality has promulgated a defective policy that an individual follows in good faith, *see Epps v. Lauderdale County*, 45 F. App'x 332 (6th Cir. 2002) (Cole, J., concurring), or municipal inaction is the cause of the constitutional breach, *Hart*, 973 F.3d at 646. But there is no reason to think that this is one of those unusual cases. The Court's analysis leads to the conclusion that *no one* violated Henry's constitutional rights, not just Defendants in this action. *Martinez v. Wayne County*, No. 24-1474, 2025 WL 1733451, at *9 (6th Cir. June 23, 2025) ("[O]ur precedent shows that 'there can be no liability under *Monell* without an underlying constitutional violation.'" (cleaned up) (quoting *Chambers v. Sanders,* 63 F.4th 1092, 1101–02 (6th Cir. 2023))). That dooms Plaintiff's claim against Benzie County.

Finally, in light of the dismissal of Plaintiff's federal claims, the Court declines to exercise supplemental jurisdiction over Plaintiff's claim under Michigan civil rights law. *See Experimental Holdings, Inc. v. Farris*, 503 F.3d 514 521 (6th Cir. 2007) ("Generally, once a federal court has dismissed a plaintiff's federal law claim, it should not reach state law claims." (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966))). The state's courts are in the best position to evaluate Plaintiff's state law claim. This Court therefore dismisses the claim without prejudice.

## IV.   CONCLUSION

The complaint is dismissed in its entirety.  An order and judgment consistent with this opinion shall issue.

Dated: July 10, 2025                              /s/ Hala Y. Jarbou
                                                  HALA Y. JARBOU
                                                  CHIEF UNITED STATES DISTRICT JUDGE